UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Kenneth G. Deas, | ) | |
| | ) | C/A No. 3:06-cv-2058-GRA |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | (Written Opinion) |
| Michael J. Astrue[1], Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court to issue a final order on the magistrate's Report and Recommendation made in accordance with Local Rule 73.02, D.S.C. issued on August 13, 2008. Plaintiff brought this action on July 18, 2006, pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Disability Insurance Benefits ("DIB"). On November 20, 2006, the Commissioner filed a motion to dismiss. Plaintiff filed a response on November 21, 2006. The Court denied the motion to dismiss on April 27, 2007 and ordered that the case proceed on the merits. The magistrate judge recommended affirming the decision of the commissioner. For the

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Therefore, pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue will be substituted for Defendant JoAnne B. Barnhart from this point forward.

reasons stated herein, the Court declines to adopt the magistrate's Report and Recommendation.

## BACKGROUND

On March 4, 2002, the plaintiff filed for DIB alleging seizures, prostate problems, and hemorrhoids commencing on November 20, 2000.  His application was denied initially and on reconsideration, and he requested a hearing before an administrative law judge ("ALJ").  The plaintiff, the plaintiff's sister, and vocational expert ("VE") testified at the hearing on November 19, 2003.  The ALJ issued an opinion on March 22, 2004 denying benefits.  The plaintiff appealed to the Appeals Council on March 31, 2004.  The Appeals Council denied the request for review and the ALJ's decision became the "final decision" of the Commissioner for purposes of judicial review.  The plaintiff filed in federal court on July 18, 2006.  After the Court denied the motion to dismiss based on the defendant's unsuccessful argument of an untimely appeal, the case proceeded on the merits.

## STANDARD OF REVIEW

The magistrate makes only a recommendation to this Court.   The recommendation has no presumptive weight, and responsibility for making a final determination remains with the Court.  *Matthews v. Weber,* 423 U.S. 261, 270-71 (1976).  This Court is charged with making a *de novo* determination of those portions

of the Report and Recommendation to which specific objection is made, and this Court may "accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate."  28 U.S.C. § 636(b)(1).  This Court may also "receive further evidence or recommit the matter to the magistrate with instructions." *Id.*  In the absence of specific objections to the Report and Recommendation this Court is not required to give any explanation for adopting the recommendation.  Plaintiff timely filed objections to the magistrate's Report and Recommendation on August 15, 2008.

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one.  Section 205(g) of the Act provides: "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).  "Substantial evidence has been defined innumerable times as more than a scintilla, but less than a preponderance." *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  This standard precludes a de novo review of the factual circumstances that substitutes the court's findings for those of the Commissioner.  *Vitek v. Finch*, 438 F.2d 1157, 1157 (4th Cir. 1971).  The court must uphold the Commissioner's decision as long as it is supported by substantial evidence.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  "From this it does not follow, however, that the findings of the administrative agency are to be mechanically accepted.  The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969).  "[T]he courts must not abdicate their responsibility

to give careful scrutiny to the whole record to assure that there is a sound foundation for the Secretary's findings, and that his conclusion is rational." *Vitek*, 438 F.2d at 1157-58.

The Commissioner's denial of benefits shall be reversed only if no reasonable mind could accept the record as adequate to support that determination. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Commissioner's findings of fact are not binding, however, if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## STATEMENT OF FACTS

Mr. Deas was fifty three years old on the date of the ALJ's decision. (Tr.31). He has a high school education and prior work history as a laborer. (Tr. 51, 56).

In 1990, the plaintiff was hospitalized for several days for treatment of a reactive psychosis and seizure disorder. (Tr. 189-192). The attending neurologist at the time noted that "with proper rest, nutrition, and compliance with medication, [the plaintiff] ha[d] good control of his epilepsy." (Tr. 191). The reports at that time indicated that he was frequently not compliant with the drugs. He was living alone at this time and had a psychiatric condition. However, when his daughter lived with him, he was compliant with his medication. The psychotic behavior resolved over the hospital stay and the doctor thought it was likely due to the seizure disorder. The doctor noted only "marginal control" of the disorder. (Tr. 191-192).

South Carolina Department of Corrections ("SCDC") Health Services records indicate that the plaintiff was incarcerated from approximately December 2000 to February 2002. (Tr. 201-79). While the plaintiff was incarcerated, he was restricted from climbing, food service work, work with chemicals or irritants, work at extreme heights, and work around machines with moving parts because of his seizure disorder. (Tr. 234-35).

According to SCDC medical records, the plaintiff reported having seizures on January 2 and 19, 2001. Lt. Miller took the plaintiff to medical on January 2, 2001 after the reported seizure. (Tr. 229). The plaintiff reported compliance with medication on that date and immediately after the seizure he was combative and disoriented but as time passed, he was able to sleep quietly. (Tr. 229). On February 12, 2001, the plaintiff reported no seizure activity and compliance with his seizure medication. He denied any seizure activity since October 30, 2000 to the physician on that date. (Tr. 226-29)

On March 23, 2001, the plaintiff reported another seizure. After the seizure was over, he reported that he wanted to be left alone and wanted to sleep. He stated he was taking his Dilantin as required. The plaintiff's roommate saw the seizure and stated it lasted two to three minutes. (Tr. 224). On March 26, 2001, his labs reported a toxic level of Dilantin. (Tr. 223). Again on March 30, 2001, the plaintiff's roommate called emergency medical as his roommate was having a seizure. Records state that he was not having a seizure on arrival but was "unresponsive to verbal

stimuli" and was combative when they attempted to move him to medical.  (Tr. 223).

When moved to medical, the plaintiff was "sleeping deeply, very unresponsive,

combative." (Tr. 222).  After the seizure, his Dilantin level was checked and was at

a level of 12.9. (Tr. 222).  The doctor stated that it was below normal; however, later

evidence shows that the actual acceptable therapeutic levels are between ten and

twenty. (Addtl. Evid. 5).

On April 15, 2001, the plaintiff reported another seizure.  Upon the medical

staff's arrival, the plaintiff was standing up urinating, then laid back on the bed and

began grinding his teeth.  He covered his head and refused to answer questions.   (Tr.

220).

Again on May 20, 2001, the medical records indicate more seizure activity.

Upon arrival to the dorm, the medical staff noted that the plaintiff was grinding his

teeth, lying on the bed with his hands over his head and non-responsive to

questioning.  When the staff placed ammonia under his nose, he rubbed his nose.  The

staff did not see the seizure and put in the medical records "no seizure activity noted;"

however, he remained in medical for the evening.  (Tr. 218).

Plaintiff's roommate called emergency medical on June 6, 2001 stating that the

plaintiff was having another seizure, but was fine now.  He was not in distress.  (Tr.

217).   June 7, 2001, the plaintiff reported two seizures to which his roommate

witnessed.  Upon arrival, the medical staff witnessed the plaintiff sleeping. (Tr. 216).

Officer Sessions called medical on June 25, 2001 after plaintiff reported another

seizure. (Tr. 216). Medical records from July 19, 2001 report compliance with Dilantin and additional seizures on June 19 and 20, 2001. (Tr. 215). July 20, 2001 reports another seizure with the plaintiff's roommate witnessing the event. The roommate told medical that he likes to sleep after a seizure. He was unresponsive to medical staff. (Tr.215).

SCDC records report another seizure on August 1, 200. Plaintiff had a blank stare and rested for ten minutes before he would allow medical staff to transport him to medical. The plaintiff reported that he was compliant with his medication and responded to his name but could not recall his department of corrections number or his room number. (Tr. 213-214). He stated that the electricity, stress of noise, and food causes his seizures. (Tr. 212).

Medical records again noted compliance with medication on September 5, 2001, October 8, 2001, and January 30, 2002. (Tr. 211, 212, 205). On November 4, 2001, the plaintiff has another seizure reported on his medical records. The plaintiff's roommate witnessed the seizure and stated that he was foaming at the mouth earlier. The plaintiff was sleeping when help arrived and initially refused to go to medical. He was more alert and responsive about twenty minutes in medical. (Tr. 209).

On November 30, 2001, the plaintiff was taken to medical on a stretcher after a seizure. (Tr. 208). Seizures were reported on December 7 and 8, 2001 and January 1, 2002 with the same disorientation, blank stare, sleepiness, and refusal to go to medical. (Tr. 207, 206).

The SCDC drug administration records include a single notation on January 19, 2002 of the plaintiff refusing the Dilantin. (Tr. 244). February 2, 2002, the plaintiff reported that he did not have his Dilantin and that he would need it later that night. (Tr. 205). All the lab records testing the plaintiff's level of Dilantin were either within the acceptable range or too high. (Tr. 254, 256, 261, 262, 263, 266, 267).

The medical records from the Free Medical Clinic indicate that the plaintiff lost control over the seizure disorder in 1999. (Tr. 200). On March 3, 2002, the plaintiff went to the clinic for more Dilantin. On this day, the doctor noted that the plaintiff reported having about four seizures a month. The doctor refilled the medication and referred him to a neurologist. He stated that the seizure disordered was uncontrolled. (Tr.139, 200). The plaintiff's blood pressure was well controlled on medication. (Tr. 200). The records still indicate that he has continued problems with his prostate. (Tr. 198). On June 13, 2002 the plaintiff again reported about two to three seizures a month for the last three to four years. On July 25, 2002 the plaintiff went to the free clinic after a seizure which resulted in falling on his face. The nurse noted "some discoloration still present." The plaintiff's Dilantin level on that day was 20.4. (Tr.197). On September 12, 2002, the plaintiff again reported a seizure to the Medical Clinic. (Tr. 196). January 22, 2003, the plaintiff reported a "bad seizure" to the Medical Clinic. The seizure resulted in a fall with significant shoulder pain. (Tr. 195). March 23, 2003 reports another seizure in the Medical Clinic records. This seizure resulted in a frontal sinus fracture which the Clinic stated would require surgical repair.

(Tr.194).  Dilantin level was 9.3 on this  date, slightly below therapeutic range but plaintiff was also on additional seizure medications on the date the test was administered.  The doctor increased his dosage of Dilantin that day.  (Tr. 193).

On April 16, 2002, state examiner Dr. William E. Gause, Jr. evaluated the plaintiff.  The plaintiff reported to Dr. Gause a extensive history of a seizure disorder with approximately one seizure a week.  He stated that his last seizure was on February 16, 2002.  Dr. Gause noted that the plaintiff had trouble giving a concise history of his condition and most likely could not give him a proper history.  He reported a history of prostate infection, hypertension, and depression.  Dr. Gause stated that he would be capable of managing his monthly benefits.  (Tr. 128-9).

Psychiatrist Thomas V. Martin examined the plaintiff on April 23, 2002.  He reported that "he had not been right since his wife left him" and was admitted to hospital care for a psychiatric condition after she left.  He was anxious and apologetic for his forgetfulness. Dr. Martin also reported that he as a poor historian due to forgetfulness and difficulties with concentration.  The doctor stated that he met the diagnostic criteria for a depressive disorder.  The plaintiff reported crying spells, uncontrolled grand mal seizures, prostatitis and hypertension.  He noted he did not abuse alcohol but did in the past.  At the examination, the plaintiff stated that he occasionally cooks but his sister did most of the cooking, cleaning, and laundry.  He occasionally went to church but mostly stayed at home and watched television. Dr. Martin stated that he would benefit from neuropsychological testing and psychotropic

medication management. The doctor stated that the memory and concentration problems may be due to his epileptic disorder. He stated that the plaintiff "needs further medical management for his epileptic and other medical disorders." He diagnosed the plaintiff with depression. He stated the plaintiff "was not competent to manage his own finances." (Tr. 132-34).

Dr. Klohn, Jr., also a psychologist, examined the plaintiff regarding the possibility of obtaining benefits. Plaintiff told Dr. Klohn about his seizure disorder but stated he could not remember his last seizure but thought it was two weeks before, that he had hypertension, prostate problems, headaches, and sinus problems. He reported a prior history of mental health problems. (Tr. 184). He also reported doing some yard work by cutting the grass and raking leaves. (Tr. 185). During the testing, the plaintiff fell to the floor and picked himself up. He said he had a seizure. Dr. Klohn did not witness the incident. (Tr. 185). Dr. Klohn stated that the plaintiff did not have any adaptive behavior limitations. He could cook and clean house. (Tr. 186). Dr. Klohn stated that he could manage his money. (Tr. 187).

Dr. McCall opined on December 23, 2002 that the plaintiff had a moderate impairment and memory problems but was "still able to do simple tasks and could sustain that pace without special help or supervision for requisite time periods and sustain that pace for a work-day." (Tr. 144). Dr. McCall, a psychological consultant, did not evaluate the effect on his seizure disorder and the memory impairment with the plaintiff's ability.

The plaintiff testified at the hearing that he worked up until 2000 when he was incarcerated.  He stated that after a seizure he has problems from biting his tongue, weakness, memory loss, and he has to sleep because he is tired.  (Tr. 287).  He stated it takes about two to three days to recover from a seizure.  He had to surrender his driver's license because of the seizure disorder.  He has trouble with his memory.  (Tr. 288).  He cannot deal with stressful situations because it brings on seizures.  He testified that he took his medications regularly.  (Tr. 289).  He told the ALJ that he stopped drinking years ago because the alcohol brought on seizures.  He said he had seizures "maybe two or three time a week, as far as I can remember. Or one or two time a week, as far as I can remember… or maybe every other week or something like that…".  (Tr. 291).  He has minor seizures and grand mal seizures and loses consciousness with all of them.  (Tr. 292).  He has no warning that a seizure is about to occur.  (Tr. 293).  He has seizures at night as well as during the day.  (Tr. 301).  He takes his seizure medication, blood pressure medication, and allergy medication daily.  The Dilantin, used to control seizures, causes drowsiness and weakness.  (Tr. 294-95).  He receives all medical treatment at the Free Medical Clinic.  (Tr. 295).  He reports continued problems with his prostate, hemorrhoids, and that his seizures have gotten worse with age.  (Tr. 297).

The plaintiff stated that he lives with his sister.  (Tr. 293).  His sister takes care of him during the day and she works at night. His neighbors check on him when his sister is at work.  (Tr. 298).  He stated that he helps with yard work but his sister

takes care of the cooking and cleaning. (Tr. 299). He occasionally goes to church but does not hold a position there. His sister makes sure he goes to meet with his parole officer. (Tr. 300).

Ms. Lang, the plaintiff's sister also testified. She stated she and her brother have lived together for thirteen years. (Tr. 307) She stated that his seizure condition has gotten worse over the years. She stated that he has become more combative over the years and it is very difficult to restrain him during and after seizures. (Tr. 303). She stated that stress makes the seizures worse. She was living with him when he went to the mental hospital; he was there for paranoia and fearing people. It caused him to fight people. (Tr.304).

Ms. Lang stated that if the plaintiff was outside of his routine, that it would increase seizure activity. She stated that in the work place, supervisors would have to constantly repeat directions to him, and the intense focusing could cause a seizure onset. (Tr. 305).

Ms. Lang has observed his seizures on many occasions. She said that the worst seizures would last about ten minutes. During a seizure she states the plaintiff would grit his teeth, and when he comes out of it he is combative. She stated that after the worst seizures, when he comes back to the focusing stage, it would take two to three days to recover. (Tr. 305). After the small seizures, he would just sit and stare. It generally takes a day for him to recover from the small seizures, and they would have

to closely monitor him. Ms. Lang stated that she monitors his medication use and that he does take it regularly. (Tr. 306).

The plaintiff has a good work history. His sister stated "[t]hat's something he's never avoided, working." (Tr. 306). She said he would go to work unless he had to stay home from a seizure. That stay could last anywhere from two to three days or a week if severe. (Tr. 306). She said that up until 2000 he worked regularly.

Ms. Lang also discussed his concentration problems and short term memory problems. She also said that he has some anger issues due to "the process of his mind". (Tr. 307). He was convicted of assault in 2000. She said that it was her understanding that he had a seizure, came out of the seizure and a fight came about. (Tr. 309). He has displayed that behavior at home as well. (Tr. 309). This is the only account regarding the facts underlying the plaintiff's incarceration.

She said the plaintiff takes care of himself well. He has to rest to take care of himself during the two to three day recovery period, but he can walk around and eat. She keeps him from leaving the house during the recovery period because he has not come back to "full faculties" to respond to things properly. (Tr. 309). He is not focused during the recovery time. She says that he has seizures two to three times a month. (Tr. 310).

A vocational expert ("VE") testified at the hearing. The VE answered the ALJ's hypotheticals. In response to the first hypothetical, the VE stated that a person reaching advanced age with a high school education and a work background as a

laborer with a seizure disorder, depressive disorder and high blood pressure would be able to perform light unskilled work as a packer, assembler, or laundry service jobs of which approximately 2,000 exist in South Carolina.  He stated that those jobs were low stress jobs in that the employee would work with one to two people and they were low production.  (Tr. 313-14).  The ALJ added a concentration limitation to the hypothetical and the VE stated that the individual would not be employable. (Tr. 315).  The attorney also posed a hypothetical that added a limitation of no production due to stress.  The VE stated that it would also take the plaintiff out the workforce.  (Tr. 317).

## DISCUSSION

The plaintiff makes three specific arguments in his objections to the Report and Recommendation regarding the lack of sufficient evidence to uphold the ALJ's finding and the ALJ's failure to properly follow the law and regulations.  First, the plaintiff argues that the ALJ erred in failing to comply with Social Security Ruling ("SSR") 96-8p by failing to explain how he came up with his residual functional capacity ("RFC") assessment in light of the ALJ's acknowledgment that the plaintiff had a seizure disorder.  Second, the plaintiff states that the Report and Recommendation is erroneous in finding non-compliance with seizure medication.  Last, the plaintiff alleges that the ALJ failed to comply with SSR 00-4p by not resolving the conflicts between the VE's testimony and the Dictionary of Occupational Titles. (Objections of Plaintiff).

The Court cannot uphold the ALJ's factual findings and ultimate result because it is not supported by substantial evidence and was not reached through the application of correct legal standards. *See Mastro v. Apfel*, 270 F.3d 171 (2001).

## Failure to Explain the RFC

The plaintiff argues that the ALJ erred in failing to explain the RFC. RFC is a measurement of the most a claimant can do despite his limitations. *See* 20 C.F.R. § 404.1545(a). According to the Social Security Administration, this is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." The regular, continuing basis is the work week eight hours a day, for five days a week, or an equivalent work schedule. *Id.*

The ALJ stated that the claimant has the following RFC: no exertional limitations, he is unable to work with heights or hazardous machinery, climb, balance or operate automotive equipment. He is restricted to routine, repetitive tasks in a low-stress environment. (Tr. 21). With his, the ALJ concluded that the plaintiff could work as a packer, entry-level assembler, or laundry folder/turner. (Tr. 25). The ALJ bases this on the fact that he does not find the plaintiff's testimony credible as he could cut grass, attend church, and walk without difficulty. The ALJ also states that the recovery period is not as long as the plaintiff alleges and there is no evidence of forgotten seizures. The ALJ also stated that the depression gives him a mild limitation

with daily living and social functioning and moderate limitations with concentration, persistence or pace and no episodes of decompensation.

According to SSR 96-8p, the ALJ's RFC assessment must include narrative discussion describing how the evidence supports each conclusion, citing specific medical and nonmedical evidence. Additionally, the RFC assessment must be based on all of the relevant evidence in the case record, such as: medical history, medical signs and laboratory findings, the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, recorded observations, medical source statements, evidence from attempts to work, need for a structured living environment, and work evaluations, if available.  SSR 96-8p (1996).  The evidence in the record cannot sustain the ALJ's finding regarding the plaintiff's RFC.

First, the ALJ and magistrate state that the claimant's assessment regarding the severity of his disorder is not credible because he stopped working due to his imprisonment not due to his medical limitations and he can sit without difficulty, walk without difficulty, mow grass, visit friends and go to church. (Tr. 22). The magistrate is correct in stating that the ability to work with the condition is evidence to support a denial of benefits according to *Dixon*. *See Dixon v. Sullivan*, 905 F.2d 237 (8th Cir. 1990).  However, the holding in *Dixon* is limited to the extent that a claimant who works with impairments over a period of years without any worsening of the condition

is not entitled to benefits.  The Fourth Circuit case law is also similar.  The court held in *Cauthen v. Finch*, (426 F.2d 891 (4th Cir. 1972)) that a claimant was not disabled when she had eye problems of long standing, worked regularly for many years despite the problem and evidence showed no significant deterioration.  The ALJ and the magistrate failed to address the worsening of the condition.

In 1990, doctors stated that the seizure disorder would be well controlled with medication. (Tr. 189-192).  However, the prison records, other medical evidence, and the plaintiff's and the plaintiff's sister's testimony suggest a worsening and loss of control over the condition before November 2000.   The fact that the claimant quit work due to his incarceration alone is not sufficient to support a finding of non-disability.  When as claimant stops working for reasons unrelated to his medical condition, it **may** support a finding that the claimant is not disabled. *Cauthen*, 426 F.2d at 892.   Although the plaintiff was precluded from working due to his incarceration, the evidence is sufficient to conclude that the condition began to worsen at the time of incarceration.

The ALJ places significant weight on the plaintiff's ability to perform the acts of daily living such as sitting, walking, going to church, and occasionally doing yard work.  However, the Fourth Circuit has held that such activities do not establish the ability to work on a full time basis.  The court in *Hines v. Barnhart* found that the ability to attend church, occasionally do repairs such as fixing a doorknob, cutting the grass, visiting the sick, going out to eat, does not refute disability in certain

circumstances and does not establish the ability to work full time despite the illness. *Hines*, 453 F.3d 559 (4th Cir. 2006).  The plaintiff occasionally goes to church and helps with yard work, but this work is similar to the above referenced case.  These limited activities do not establish the ability to work full time especially with an uncontrolled seizure disorder.  There is no inconsistency between the medical records, and testimony regarding the plaintiff's condition and ability to walk, sit, go to church, or do yard work.  The plaintiff has an epileptic disorder, this has no impact on the ability to sit, walk, talk, or occasionally visit church, friends and do yard work.  "An individual does not have to be totally helpless or bedridden in order to be found disabled under the Social Security Act."  *Totten v. Califano*, 624 F.2d 10 (4th Cir. 1980), (*citing Thorne v. Weinberger*, 530 F.2d 580 (4th Cir. 1976) and *Thomas v. Celebrezze*, 331 F.2d 541 (4th Cir. 1964)).  The Court finds the weight placed on the consideration of the plaintiff's activities error for both the ALJ and the magistrate.

The ALJ also states that the seizure disorder is not as severe as the plaintiff alleges.  The ALJ must make credibility determinations and must explain those determinations based on the evidence. *Hammond v. Heckler*, 765 F.2d 424, 427 (4th Cir. 1985).  The ALJ bases this opinion on the jail medical records.  The jail records often state that the jail personnel did not see a seizure and thus characterized the seizure as "alleged."  The magistrate points out that Dr. Klohn listed factitious disorder and malingering in the plaintiff's evaluation records to support the finding.  However, these were ruled out as possible diagnoses.  (Tr. 187).  The magistrate also states that

the prison records characterize the seizures as "alleged" as the staff did not witness the seizures and that on some occasions, the plaintiff's behavior was inconsistent with have a seizure.  The Court finds that the ALJ's credibility assessment is deficient in light of the totality of the evidence.

The Court believes that the records characterize the seizures as "alleged" merely because they were not witnessed by prison staff and that the records state that the plaintiff was not foaming at the mouth nor had they seen any urine or incontinence. (*See* Tr. 209).  The plaintiff's sister and the plaintiff himself have stated that he has seizures that vary from mild to severe.  It is likely that a mild seizure would not produce the above symptoms.  By the time that medical staff reached the plaintiff's cell, the seizure event had likely terminated.  The plaintiff's roommate witnessed seizures on numerous occasions.  The plaintiff's sister stated that the plaintiff has large and small seizures, and that most severe seizures could last up to ten minutes. She did not state how long the smaller seizures last.  The doctor at the Free Medical Clinic stated the seizure disorder is uncontrolled.  The plaintiff has fallen on numerous occasions due to the seizures.  One seizure actually caused the plaintiff to fall and break his nose requiring surgical repair.  (Tr. 197).  The plaintiff's inconsistent statements regarding when he had seizures are irrelevant as the inconsistencies may be explained by the disorder itself. The plaintiff has been found to have a problem with his memory likely due to the seizure disorder. The plaintiff, Ms. Lang, and numerous doctors have stated that he has trouble with his memory and has trouble reciting a

complete medical history.  (Tr. 132, 144, 287, 288, 307).  These inconsistencies are explained by the problems with his memory.  This finding that the plaintiff's disorder is not severe as he alleges is simply not based on substantial evidence.  The Court finds that the severity of the disorder is consistent with the plaintiff's testimony as evidenced by the medical records.

The ALJ also states that the plaintiff was not compliant with his drug treatment regime.   According to SSR 82-59, a claimant who does not follow prescribed treatment measures may be denied benefits. *See also*, 20 C.F.R. § 404.1530.  The evidence in the record must show that there has been refusal to follow prescribed treatment in order to sustain a denial.  SSR 82-59.  The magistrate bases this finding on the finding that in 1990, the plaintiff had moderate control over his epilepsy and the statement from the psychiatrist Dr. Martin that the plaintiff "has been seen for a number of years. . . for a seizure disorder that has been difficult to control, it is unclear whether or not this is due to breakthrough seizures or due to medication non-compliance."  (Tr. 132).  However, this statement by Dr. Martin was in the plaintiff's medical history, and non-compliance was not inquired into during the examination.  The statement was an unanalyzed conclusory statement that this Court finds unpersuasive.

In this case, the evidence in the record cannot withstand a finding of refusal to follow treatment.   There are two instances in the record suggestive of drug noncompliance.  The first dates back to 1990 when the plaintiff was hospitalized for

reactive psychosis and a seizure disorder.  (Tr. 191-192).  At that time, the plaintiff candidly admitted that he was not compliant with his treatment.  This record is dated and is not persuasive on this Court.  All other records show and testimony admits compliance with the treatment.  The second instance is in the drug administration records from the jail; it notes a single incident of the plaintiff refusing to take his Dilation on January 19, 2002 in the pill line.  (Tr. 244).  However, this is the only notation in the drug records.  The remainder of the medical record show compliance with his drug regimen.  All the lab records testing the plaintiff's level of Dilantin were either within the acceptable range or too high.  (Tr. 254, 256, 261, 262, 263, 266, 267).  On one incident, the Dilantin level was toxic.  Although the plaintiff did not take the medication on the pill line, he could have gotten it from another source.  There are many instances where the plaintiff would ask for his Dilantin.  On February 2, 2002, the plaintiff reported that he did not have his Dilantin and would need it later.  (Tr. 205).  The medical records from the Free Medical Clinic show constant changes in the dosages of Dilantin because the disorder was uncontrolled.  It also states that the plaintiff came to the clinic to refill his Dilantin and sought other medications to help control the seizure condition.  (Tr. 193-200)  These incidents, along with lab records testing the plaintiff's Dilantin levels strongly suggests that the he was compliant with his drug regimen.  In addition, the records show that the plaintiff requested Dilantin when he knew he would need it.  Two instances of non-compliance in the entirety of

the medical records, with one instance being over ten years old cannot sustain a finding of non-compliance with medical treatment.

The ALJ also bases his decision partly on the fact that no doctor has opined that the plaintiff is unable to work. The ALJ and magistrate failed to address the fact that SCDC placed the plaintiff on work restrictions. (Tr. 234-235). In addition, the ALJ failed to consider the nature of the plaintiff's medical care. The plaintiff is seen primarily at the Free Medical Clinic to monitor his medication and seizure disorder and to obtain medication refills. He has consistently stated that he cannot afford medical treatment thus his need to receive care at the Free Clinic. Although the treatment was not inadequate, it is generally known that the nature of care at free clinics is adequate but minimalistic due to the limitation of resources. A claimant may not be penalized for failing to seek treatment he cannot afford; "it files in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him." *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1984). Although this speaks towards obtaining treatment for the ailments a claimant alleges, this Court finds it persuasive in the situation of a failure to obtain an opinion that a claimant is unable to work. The plaintiff's primary care physician at the Free Clinic stated the disorder was uncontrolled. (Tr. 200). The plaintiff sought treatment to control the disorder, not an opinion that he was unable to work. The ALJ may not place significant weight on the inexistence of a medical

opinion stating he was unable to work due to his inability to obtain other medical treatment or opinions and the limited resources available at the free clinic.

It is apparent from the record that the ALJ sifted through the record to find evidence to support a denial of benefits for the plaintiff. "An ALJ may not select and discuss only that evidence that favors his ultimate conclusion." *Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) (*citing Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)). The ALJ ignored the medical evidence from the Free Medical Clinic and the Department of Corrections regarding the constant therapeutic levels of Dilantin in the plaintiff's system. The ALJ does not discuss the fact that the plaintiff sought medical treatment and refills for Dilantin nor the fact that the drug combinations and dosages were constantly being altered by the plaintiff's treating physician. Additionally, the ALJ ignores the fact that the plaintiff's treating physician stated that the disorder was uncontrolled. (Tr. 200). The Fourth Circuit requires that the opinion of a claimant's treating physician be given great weight and disregarded only if there is persuasive contradictory evidence. *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1987). There is no such contradictory evidence here, and the ALJ committed error in not discussing the treating physician's statements.

The ALJ also erred in not discussing the plaintiff's intermittent incapacity. In assessing the RFC, the ALJ must discuss the individual's ability to perform work on a regular and continuing basis. SSR 96-8p. The ALJ only addressed the effects of depression on the plaintiff's RFC; the ALJ did not discuss the seizure disorder despite

the fact that he found the disorder to be a severe impairment.  (Tr. 24).  In his opinion, the ALJ found that there was no recovery period after a seizure.  This finding is contrary to the medical evidence.  Although it is disputed as to how long the plaintiff takes to recover after a seizure, it is undisputed that there is a recovery period after a seizure.  The plaintiff and plaintiff's sister state it takes a day to a few days to recover depending on the type of seizure.  (Tr. 306). The medical evidence from the Department of Corrections does not state specifically the recovery time,  but after a seizure, the record is consistent in that the plaintiff slept for a while before they would be able to transport him to the medical facility.  He would generally spend the night there and rest in the medical department.  (Tr. 205-229).  This recovery period shows that the plaintiff has significant periods of intermittent capacity.

Since the ALJ found no recovery period, he did not discuss how this recovery period would affect the plaintiff's work day in the event that a seizure occurred on the job.  The court stated in *Totten v. Califano*, 624 F.2d 10 (4th Cir. 1980) that the ALJ must consider and make specific findings on whether intermittent incapacity affects an individual's ability to perform work in an ordinary setting on a regular and continuing basis.  The ALJ erred when he made no specific findings nor discussed the possible periods of incapacity.   The ALJ notes limitations based on the seizure disorder, but does not discuss the work related effects of the unpredictability of the seizures.  When the attorney asked the VE what effect an uncontrolled seizure disorder would have on the plaintiff's ability to work the VE stated:

> this individual could most probably perform this and other jobs. However, the
> unpredictability of the [seizures] . . . would create a problem for him keeping the
> job once he's on the job. Because these jobs only allow [ten] to [fifteen] days
> personal leave time in the [twelve] month period.

(Tr. 318). The Fourth Circuit has stated that although jobs may exist in the plaintiff's

area in significant numbers, the jobs may not be available to a claimant if the claimant

is "handicapped, particularly if they have no special skills." *Cooke v. Celebrezze*, 365

F.2d 425, 428 (4th Cir. 1966). An employer's fear of absenteeism and higher

worker's compensation premiums and whether an employee in the plaintiff's condition

would be able to perform satisfactorily in the job are factors that play against the

plaintiff's employability. *See Cooke*, 365 F.2d at 428. The unpredictable frequency

and severity of the plaintiff's seizures are insurance risks for employers, and the

recovery period, no matter how long, is a problem for absenteeism in this case. These

factors indicate there is a clear issue regarding the plaintiff's ability to obtain and

maintain employment. The Fourth Circuit, in *Tinsley v. Finch*, ((300 F.Supp.

247)(D.S.C. 1969)) adhered to the rule that:

> where the hiring practices of employers, based on health insurance, workmen's
> compensation premiums, and liability insurance, preclude the hiring of an
> employee because of his physical impairment, [the plaintiff] must, under the
> statute, be considered disabled for all the kinds of work he has previously done
> in such employment, and for all such employment in the future.

*Sayers v. Gardner*, 380 F.2d 940, 952 (6th Cir. 1967). The ALJ's failure to discuss

the plaintiff's seizure disorder's effect on the ability to obtain maintain employment is

error in light of Fourth Circuit precedent. The Court finds that the disorder is

problematic and possibly preclusive in the plaintiff's ability to obtain and maintain employment; therefore, the Court finds the plaintiff disabled and incapable of performing any gainful employment.

## Failure to Comply with SSR 00-4p

The plaintiff argues that the ALJ erred in failing to comply with SSR 00-4p. SSR 00-4p, places an affirmative duty on the ALJ to inquire into any apparent unresolved conflict between jobs cited and the DOT. The Court notes that the plaintiff erroneously states the law contained in this Ruling in his brief. He argues that the ALJ must inquire into "any possible conflict" in the VE's occupational testimony and information in the Dictionary of Occupation Titles ("DOT"). However, SSR 00-4p states any "apparent" conflict not "possible conflict." SSR 00-4p. Before the ALJ may rely on the VE's testimony, he must properly develop the VE's testimony and resolve any apparent conflict with the testimony and the DOT.

In order for a VE's opinion to be helpful and relevant, it must be based upon a consideration of all the evidence on the record and must be in response to hypothetical questions which fairly set out all plaintiff's impairments. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). The hypotheticals need only reflect those impairments supported by the record. *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3th Cir. 1987). An ALJ may not rely on the answer to a hypothetical question where the hypothetical fails to fit the facts. *Swain v. Califano*, 599 F.2d 1309 (4th Cir. 1979), *see also Cornett v. Califano*, 590 F.2d 91 (4th Cir. 1978). The plaintiff alleges that the ALJ

erred because the hypothetical failed to take into account the "effect of seizures upon the frequency, predictability, and urgency of absences of the workplace as a result of the seizures." (Pl. Brief 1-2). The magistrate states that the ALJ's findings that the disorder was controlled when compliant with medication, that the testimony regarding severity of the disorder was not credible, was supported by substantial evidence, and there was no error in not including these in the hypothetical. The Court has addressed these erroneous findings above and finds error in the ALJ's hypothetical due to omitting the effects of the seizure disorder in his hypothetical to the VE. The hypothetical should have included the effects of the seizure disorder, and the ALJ should have inquired into the additional limitations and precautions suggested by the seizure disorder and the mental limitations which are not in the DOT definitions of the cited occupations. The court finds that the ALJ erred in relying on the VE's testimony as it was not properly developed. However, since the Court has found the plaintiff disabled, a remand to the ALJ to pose a proper hypothetical and inquire into DOT inconsistencies would be unnecessary.

## CONCLUSION

Reversal and remand to the Commissioner for further proceedings is the usual remedy when the administrative record is incomplete or when the ALJ has applied an improper legal standard. However, as expressly provided for by statue and consistent with Fourth Circuit precedent, reversing an ALJ's decision and remanding the case

strictly to award benefits is proper when "the record establishes [claimant's] entitlement to benefits." *Hines v. Barnhart*, 453 F.3d 559, 567 (4th Cir.2006).

The Court sees no useful purpose in remanding the case to the ALJ as the evidence establishes the plaintiff's disability.  The ALJ's duties are clear as mandated by statute and decisional law as described above.  The ALJ did not meet those duties and therefore Commissioner's decision is not based on substantial evidence.   The ALJ applied erroneous legal standards in determining the plaintiff's RFC, in failing to address the evidence from the treating physician, and improperly weighing the evidence.  The record is clear on the issue of the claimant's disability and inability to perform any substantial gainful employment; therefore, the Court remands solely to determine the award of benefits to which the plaintiff is entitled.

This case has a long procedural history.  On March 4, 2002 the plaintiff filed for DIB alleging disability since November 20, 2000.  The application was denied initially and upon reconsideration.  The plaintiff requested a hearing, and after the hearing with the ALJ, the ALJ issued an opinion denying benefits.  The plaintiff filed this action on July 18, 2006.  The defendant filed a motion to dismiss which was denied.  Later, on May 4, 2007, the defendant was granted a motion for an extension of time to answer the plaintiff's amended complaint. On June 12, 2007, the defendant was granted an additional extension to file the transcript and answer.  The defendant finally filed an answer on July 10, 2007.  After all briefs were filed and Report and Recommendation issued, this Court finally has review over five years after the plaintiff filed the original

application.   "People generally do not seek Social Security disability benefits. . . because they want to subsidize an already comfortable existence. In many cases, they seek benefits because they have nowhere else to turn."  *Schoofield v. Barnhart*, 220 F.Supp.2d 512, 524 (Dist. Md. 2002).   Any further delay in this matter is unwarranted, and an award of benefits is appropriate.  *See Id.*

## INELIGIBILITY PERIOD

According to 20 C.F.R. § 404.468, "no monthly benefits will be paid to any individual for any month or any part of which the individual is confined in jail, prison, or other penal institution or correctional facility for conviction of a felony."  The Court notes that the plaintiff is not entitled to back benefits for the period of incarceration.

After a review of the magistrate's Report and Recommendation, Plaintiff's objections thereto, and the administrative record, this Court concludes that the ALJ's decision is not supported by substantial evidence. The ALJ improperly applied and analyzed the law and facts. The ALJ failed to consider the record as a whole which is clear on the issue of disability.

IT IS THEREFORE ORDERED that the Commissioner's decision denying benefits be REVERSED.

IT IS FURTHER ORDERED that the case is REMANDED to the Commissioner to determine the appropriate award of benefits to for Plaintiff.

IT IS SO ORDERED.

G. ROSS ANDERSON, JR.
UNITED STATES DISTRICT JUDGE

September 5 , 2008

Anderson, South Carolina